IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA, and
WILLIAM TURNER, Relator,

Case No.: 8:13 CV1517 23 TBM

Plaintiffs,

**TO BE FILED *IN CAMERA* AND
UNDER SEAL WITH DEMAND FOR
JURY TRIAL**

v.

KFORCE GOVERNMENT SOLUTIONS, INC.,
and KFORCE, INC.,

Defendants.

_____/

## COMPLAINT

COME NOW Plaintiffs, UNITED STATES OF AMERICA, and WILLIAM
TURNER, Relator, (hereinafter referred to as "Plaintiffs") by and through the
undersigned counsel, and hereby file this Complaint against Defendants, KFORCE
GOVERNMENT SOLUTIONS, INC., and KFORCE, INC., (hereinafter referred to as
"Defendants"), and state as follows:

## NATURE OF THE ACTION

1.      This is an action commenced pursuant to the False Claims Act, 31 U.S.C.
§3729, *et seq.* (hereafter the "FCA") through Relator William Turner (hereafter
"Relator"), pursuant to 31 U.S.C. §3730(b) for and on behalf of the United States of
America (hereafter "U.S.A."). The action is brought against Defendants KFORCE
GOVERNMENT SOLUTIONS, INC. (hereafter "KGS") and KFORCE, INC. (hereafter
"KFORCE", and collectively as "Defendants").

2.     None of the allegations made below have been derived from public disclosures, and in any case Relator is an "original source" of such information and such allegations as that term is defined in 31 U.S.C. §3730(e)(4).

3.     Relator also brings in his individual capacity claims for relief for damages he suffered by reason of a retaliatory discharge and termination of his employment, in violation of 31 U.S.C. § 3730(h), and Florida's Whistleblower Act (Fla. Stat. § 448.102), and common law claims for defamation of his personal and business character and reputation, as well as count for piercing the corporate veil.

## JURISDICTION AND VENUE:

4.     This court has subject matter jurisdiction pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. 1331, as Count I and II of this action arise under the laws of the United States.

5.     This Court has subject matter jurisdiction over Relator's remaining claims under the Florida Whistleblower Statute (Fla. Stat. §448.102) and Florida State common law claims for Defamation, and to Pierce the Corporate Veil of KFORCE, INC., based upon supplemental and ancillary jurisdiction under 28 U.S.C. § 1367.

6.     Venue of this action is proper in the United States District Court for the Middle District of Florida, Tampa Division under 28 U.S.C. 1391 (b)(1) or (2) or (3) in that Defendants reside and maintain a place of business in the Middle District of Florida, Tampa Division, and a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## PARTIES:

7.     Relator is an individual citizen and resident of the State of Florida, and the City of Tampa, and was formerly employed by Defendant KGS as its Executive Vice President and Chief Operations Officer.

8.     Relator directly, independently and personally observed the activities and actions of Defendants and their agents as described below, unless alleged "upon information and belief" and to that extent Relator personally does possess such information and hold such belief.   Relator is an original source of the information provided to the Government.

9.     Defendant KGS is a Florida corporation which maintains an office and place of business located at 1001 East Palm Avenue, Tampa, FL.

10.     Defendant KFORCE, INC. is a Florida corporation which maintains an office and place of business located at 1001 East Palm Avenue, Tampa, FL.

11.     Defendant KGS is a wholly owned subsidiary of Kforce Government Holdings, Inc., which in turn is a wholly owned subsidiary of Defendant Kforce, Inc.

## FACTUAL BACKGROUND:

12.     Defendant KGS earns most if not all of its revenue from contracting work with the United States government, through one or more of its departments and agencies.

13.     On or about December 15, 2009, KGS was suspended from participating in new and renewed Federal government business and was thereafter proposed to be "debarred" from doing Federal contracting work.

14.     On or about December 29, 2009, KGS entered into an Administrative Agreement with the United States Department of the Interior, which terminated KGS'

suspension and resulted in KGS no longer being considered for debarment. As a condition of that Administrative Agreement, KGS was required to return $78,892.32 to the Department of the Interior, and to enhance its existing compliance programs, training and controls. The Administrative Agreement had a term of 3 years.

15. On or about May 3, 2012, the Administrative Agreement was amended and extended through September 30, 2013 due to a continued lack of completeness of a compliance program as determined by the Administrative Agreement Monitor and the Department of Interior. The KGS Compliance Program is administered by Kforce, through Kforce associates and leaders on behalf of KGS.

16. Upon information and belief, KGS is currently being investigated by the Department of the Navy, Office of Integrity (Division of Suspension and Debarment) due to compliance violations and fraud with respect to the US Navy classified program named DIANA.

17. Under the Administrative Agreements, a third party Monitor was appointed to supervise compliance with the Agreements (hereafter "Administrative Agreement Monitor").

18. On or about February 2, 2011, KGS hired Relator as an employee to serve as Strategic Development Officer and Senior Vice President, at an annual salary of $200,000 per year, plus participation in the KGS Management Bonus Pool.

19. Relator was hired due to his sales, delivery and strategic planning experience including his understanding of Federal compliance issues and KGS's need to come into full compliance in view of the Administrative Agreements.

20. On or about April 10, 2012, KGS promoted Relator to the Number 2 position in the organization, bearing the title of Executive Vice President and Chief Operations Officer. Relator's compensation was increased to $230,000 per year, and he continued his participation in the KGS Management Bonus Pool.

21. As the Number 2 person in KGS, Relator's mandate was to ensure KGS was compliant with all Federal regulations and requirements applicable to KGS as a Federal contractor in addition to other duties assigned.

A. **Relator's Uncovering Of Fraud**:

22. During the course of Relator's employment with Defendant KGS, he identified numerous areas in which Defendant KGS was not in compliance with a variety of requirements applicable to KGS as a Federal Contractor.

**Failure To Revise DCAA Provisional Rates:**

23. Federal Acquisition Regulation ("FAR") violations included KGS's failure to submit revised Defense Contract Audit Agency ("DCAA") Provisional Rates from 2009 through 2011, despite requirements under FAR Part 42 for establishing the final indirect cost rates for the formation of billing rates ("Indirect Cost Formulations").

24. Relator first identified this issue to Defendants in or about June 2011, and thereafter this issue was addressed numerous times in emails, in meetings with the boards of directors, and meetings with Defendants' executive leaders.

25. Defendants were already aware of KGS's improper use of 2009 provisional rates prior to commencement of Relator's employment.

26. Indirect Cost formulations are used by Federal Contracting Officers' auditors to forecast the contractors' rates (provisional or final) on all contracts and are

meant to closely approximate what contractors anticipate their actual cost rates will be for that upcoming year. Contractors are required to monitor their actual costs, compare them to final or provisional rates and throughout accounting periods, "true up" or adjust their invoices to the Federal Government accordingly. Incurred cost submissions and requests for provisional rates are required to be submitted in accordance with FAR.

27.     If a Contractor's actual cost rates are lower that their final or provisional rates, the contractor owes money back to the Federal Government.

28.     If a Contractor's actual cost rates are higher than their final or provisional rates, a supplemental invoice must be provided to the Federal Government, and a large discrepancy between actual and provisional rates may cause the Federal Government and/or DCAA to conduct an audit to determine the reason for the lack of financial management.

29.     Defendants responded to concerns over inaccurate DCAA final or provisional rates by assigning inexperienced project analysts, resulting in many inaccuracies in KGS's submitted 2012 Provisional Rate Submittal, which upon information and belief remained unaddressed as of the date of termination of Relator's employment.

30.     Upon information and belief, Defendants have made inconsistent and negligible efforts to "true up" their invoices and billing to the Federal Government from 2009 to the present to correct any inaccurate bills.

31.     Upon information and belief, KGS' initial estimates indicated that once KGS did "true up" their invoices, over one million dollars would be owed back to the Federal Government on this Provisional Rate issue alone by the end of 2012.

32.     In an email by Larry Grant dated June 29, 2012 to Kforce executives Bill Sanders and Joseph Liberatore, Mr. Grant advised them that KGS was substantially under-running its provisional rates, but advised against reporting that fact to the Federal Government for fear a large discrepancy might trigger a DCAA audit. Mr. Grant indicated his concern that such an audit would uncover other problems with KGS's finances like improper time charges in KGS' Time and Expense System. Mr. Grant indicated in that email that

> "The huge risk we face with an audit is the company being charged with 'fraudulent claims' and/or 'fraudulent reporting.' A good example of this is the negative CPAR rating we received from our DTRA customer due to four months of inaccurate invoicing. If not for the fact that KGS has a 14 year, outstanding relationship (as told us by the customer), we would be reported to the DCMA (Defense Contract Management Agency – DCAA reports to DCMA) for 'fraudulent claims' and/or 'fraudulent reporting.' We have had a similar issue with our ENSA customer and our DARPA customer. We have not yet received a negative CPAR from ENSA or DARPA, but they have sounded the warning bell. Again, our contract performance is outstanding; our business management is poor."

## MISALLOCATION OR FRAUDULENT
## CONCEALMENT OF COSTS

33.     KGS had "parked" costs in KGS onsite pools to cover for KGS customer onsite rates which were increasing during fiscal years 2009 through 2011. This concealment of costs in the KGS onsite pool had the intended effect of keeping KGS customer site rates steady, allowing KGS to appear to remain cost competitive in one cost pool but resulting in higher costs in the KGS customer site pool. Further, KGS wrote other cost overruns off expressly for the purpose of fraudulently concealing them from the Federal Government so as to continue to appear cost competitive on a critical and highly profitable contract with the Defense Threat Reduction Agency (DTRA) known as

HDTRA1-10-D-0001-0005, which had already suffered from a negative Contractor Performance Assessment Report ("CPAR") as noted above.

34.     Upon information and belief, the "parking" and writing off of costs was done specifically to make KGS appear to be more cost competitive than it was, so that KFORCE would increase its success at winning and keeping further Federal cost reimbursable contracts.

35.     Upon information and belief, in 2012 approximately 12-15% of KGS revenues came from cost reimbursable Federal contracts, which translates roughly to between $9 million dollars and $12 million dollars in annual revenue.

36.     Upon information and belief, during the years 2009 through the present, KGS won and maintained various cost reimbursable Federal Contracts, in part, because it falsely portrayed its costs so as to give the appearance of remaining competitive.

37.     Since inception of KGS, KFORCE has concealed and/or misappropriated home allocation costs in order to be price competitive and at its discretion, cover KFORCE commercial costs across its corporate holdings which include KGS.  Upon information and belief, KFORCE has submitted 2013 provisional rates to not include home office allocations for the intended purpose of winning new work in order to increase the value of KGS for an impending divesture of KGS.

### DIVERSION OF ASSETS TO COMMERCIAL PURPOSES:

38.     KGS and KFORCE, through their executive leadership, conspired to divert assets paid for by KGS's U.S. Government customers toward commercial uses so as to benefit KFORCE, without providing a credit back to KGS.

39.     Assets purchased by government monies may not be used or diverted to private or commercial purposes or gain without a credit for the value of such use being issued back as compensation for the use of such asset.

40.     One such KGS asset was a facility in San Antonio Texas, which KFORCE used to conduct commercial recruiting activities; including the use of all facilities, assets and office equipment.

41.     Another instance of diversion of KGS assets involved KFORCE's use of KGS to absorb startup, execution and support costs for commercial contracts and KGS providing personnel for KFORCE's commercial benefit, including an entity known as Kforce Healthcare.

42.     KFORCE never gave any credits back to KGS for its use of facilities, or KGS' absorbing startup costs or providing personnel for Kforce Healthcare. Upon information and belief, KFORCE has absorbed the majority of the KGS commercial entity immediately after the termination of the Relator.

## FAILURE TO FOLLOW CONSISTENT COST ACCOUNTING STANDARDS AND OTHER FINANCIAL CONTROLS:

43.     Defendants have violated Cost Accounting Standards ("CAS") through their failure and refusal to follow consistent accounting methodologies with respect to home office allocations, resulting in inaccurate invoices being issued to U.S. Government customers. Defendants' failure to make accurate incurred cost submissions since the inception of KGS as a legal entity (six years) has resulted in virtually every single invoice it has submitted to U.S. Government customers during the last six years being inaccurate and based on incorrect and false cost data.

44.    At Relator's insistence, KFORCE brought in a former retired and independent DCAA auditor in or about July 2012 to assist KFORCE in identifying and noting corrective actions for its financial organization, systems and processes. During that audit, the auditor found flaws in practices and processes, however was not granted access to the actual financial numbers.

45.    At Relator's insistence, KFORCE brought in a third party audit firm in or about November 2012 to assist in the development of new and accurate DCAA provisional rates.  During that audit firm's investigation, they discovered numerous and serious flaws in KGS' management of finances, financial controls, and lack of consistent financial practices.

46.    Relator provided updates of the lack of financial controls and violations to KGS Board of Director and KFORCE executive leadership during executive and Board of Director quarterly meetings.  In or about June 2012, KFORCE CEO David Dunkel presented himself to KGS Executive and Senior Leadership and apologized for the lack of financial management controls.

47.    As of the date of termination of Relator's employment in December 2012, Defendants had taken no action to correct the audit firm's multiple findings, and upon information and belief, the lack of financial controls and inaccurate invoicing of the Federal Government is continuing to date.

### OVERSTATING CORPORATE VALUE
### IN FINANCIAL STATEMENTS PROVIDED TO INVESTORS:

48.    During 2010 through 2012, KFORCE intentionally overstated KGS' value by releasing false future expected profits figures, known to be unattainable.

49.     During a subsequent audit, KFORCE executive Bill Sanders instructed Relator and KGS President Larry Grant to support those false future expected profits figures in communications with auditors, which Relator refused to do.

50.     KGS was eventually forced to take an impairment of $65.3 million dollars as a result, and upon information and belief, that impairment did not adequately correct the false impression KFORCE and KGS gave.

51.     Upon information and belief, KFORCE is currently undergoing a phase two impairment review.

## DEFENDANTS' COVER UP AND
## RETALIATORY TERMINATION OF RELATOR'S EMPLOYMENT:

52.     Throughout Relator's employment with Defendant KGS, he received repeated exemplary performance evaluations and positive comments regarding the performance of his duties.

53.     Relator has never been warned, reprimanded, reproved or criticized in any way for the manner in which he performed his duties, or for compliance related issues.

54.     Upon information and belief, in or about late November 2012, KGS' Chief Financial Officer David Kelly met with KGS President Larry Grant and demanded that Relator be terminated because Relator was too challenging and Relator's warnings and demands that financial improprieties and various violations of CAS and FAR be corrected, had irritated Kelly's financial team.

55.     Upon information and belief, Larry Grant refused to terminate Relator, replying that Relator was doing his job.

56.    Subsequently, on or about December 6, 2012, in a meeting with KGS President Larry Grant and Kforce General Counsel Bill Josey; Kforce President William Sanders stated that although Relator had done nothing wrong, and only had been doing his job to correct compliance issues at KGS, Sanders told Larry Grant to fire Relator, and if Grant did not fire Relator, then Grant himself would be fired.

57.    Upon information and belief, Larry Grant refused to terminate Relator as there were no adequate grounds to do so.

58.    Upon information and belief, Defendant KFORCE thereafter instructed its General Counsel, Bill Josey, to fire Relator "on behalf of" KGS and Larry Grant, but without Larry Grant's knowledge or consent.

59.    On or about December 7, 2012, Defendants terminated Relator, in a telephone conference between Relator, Bill Josey and Robin Roett (KFORCE's Director of Human Resources).

60.    At the time of termination, Bill Josey informed Relator he was being terminated for cause.

61.    At the time of termination, Bill Josey informed Relator he was being terminated as the result of information uncovered during compliance oversight activities.

62.    At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator's actions were allegedly jeopardizing KGS' performance under the Administrative Agreements.

63.    At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator's actions were in opposition to the requirements of the Administrative Agreements.

64.     At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator failed to implement a close integration of the Compliance Officer into Relator's leadership team.

65.     At the time of termination, Bill Josey informed Relator that he had been "authorized" to terminate Relator's position.

66.     At the time of termination, Bill Josey informed Relator that Defendant KGS's President, Larry Grant knew about the termination and had authorized it.

67.     Upon information and belief, after Relator's termination, one or more representatives of Defendants informed the Administrative Agreement Monitor overseeing compliance with KGS' Administrative Agreements that Relator had been terminated due to lack of performance, compliance violations and/or violation of the provisions of the Administrative Agreements.

68.     Upon information and belief, after Relator's termination, one or more representatives of Defendants informed third parties and persons employed and active in the Federal Contracting industry and community that Relator had been terminated a) by Larry Grant personally; b) for performance reasons, or otherwise for "cause"; c) for compliance related reasons; and/or d) that Relator was personally being considered for debarment from any future Federal contracting work.

69.     Upon information and belief, no "compliance oversight activities", or other good faith investigation had taken place into Relator's performance prior to termination of Relator's employment.

70.     Upon information and belief, Bill Josey had not been authorized by Defendant KGS to terminate Relator, but rather was following the instructions of Defendant KFORCE.

71.     Upon information and belief, at the time Bill Josey told Relator he was fired, no one had informed KGS executive leadership, or the KGS Board of Directors, nor had anyone at KGS authorized Relator's termination.

72.     Upon information and belief, the decision to terminate Relator was in retaliation for, and to prevent the making of further objections and warnings regarding Defendants' non-compliance, false and fraudulent invoicing of U.S. Government departments and agencies, false and fraudulent accounting practices, false and fraudulent cost allocation practice, fraudulent diversion of assets paid for by U.S. Government customers to commercial purposes without appropriate credits, and Relator's refusal to participate in providing or supporting false financial information, namely false future profits expectations, to auditors.

73.     Upon information and belief, the reasons Defendants gave for Relator's termination were false, and were made for the express purpose of covering up the real reasons for Relator's termination, which was to silence his efforts to investigate issues of non-compliance and bring KGS into full compliance with FAR, CAS and other requirements applicable to KGS as a Federal Contractor.

74.     Soon after his termination, Relator received over a dozen unsolicited communications from other members of the small and tightly knit Federal Contracting industry indicating that they had received information that Relator had been terminated

for performance problems, compliance concerns and in at least one case that Relator himself was being considered for debarment from future Federal Contracting work.

75.     Upon information and belief, such allegations originated from Defendants KFORCE and KGS and their employees.

## COUNT I

### FALSE CLAIMS ACT - 31 U.S.C. §§ 3729
### Against Defendants Kforce, Inc. and
### Kforce Government Solutions, Inc.

76.     During the course of Relator's employment with Defendant KGS, he identified numerous areas in which Defendant KGS was not in compliance with a variety of requirements applicable to Federal Contractors.

### FAILURE TO REVISE DCAA PROVISIONAL RATES:

77.     KGS failed to submit revised Defense Contract Audit Agency ("DCAA") Provisional Rates from 2009 through 2011, despite a requirement that they be updated every year, or whenever major events occur under Federal Acquisition Regulations ("FAR").

78.     Relator first identified this issue to Defendants in or about June 2011, and thereafter this issue was addressed numerous times in emails, in meetings with the boards of directors, and meetings with Defendants' executive leaders.

79.     Defendants were already aware of KGS's improper use of 2009 provisional rates prior to commencement of Relator's employment.

80.     Provisional Rates are used in Federal contracts to forecast the contractors' indirect costs on cost-reimbursable contracts, and are meant to closely approximate what contractors anticipate their actual cost rates will be for that upcoming year.  Contractors

are required to monitor their actual rates, compare them to provisional rates, and within six months of the end of an accounting period, "true up" or adjust their invoices to the Federal Government accordingly. Provisional Rates should be updated at least annually at the beginning of each fiscal year.

81.     If a Contractor's actual cost rates are lower that their provisional rates, the contractor owes money back to the Federal Government.

82.     If a Contractor's actual cost rates are higher than their provisional rates, a supplemental invoice must be provided to the Federal Government, and a large discrepancy between actual and provisional rates may cause the Federal Government and/or DCAA to conduct an audit to determine the reason for the lack of financial management.

83.     Defendants responded to concerns over inaccurate DCAA provisional rates by assigning one single, inexperienced project analyst, resulting in many inaccuracies in KGS's submitted 2012 Provisional Rate Submittal, which upon information and belief remained unaddressed as of the date of termination of Relator's employment.

84.     Upon information and belief, Defendants have never made any effort to "true up" their invoices and billing to the Federal Government from 2009 to the present to correct any inaccurate bills.

85.     Upon information and belief, initial estimates made by KGS President Larry Grant indicated that once KGS did "true up" their invoices, over one million dollars would be owed back to the Federal Government on this Provisional Rate issue alone by the end of 2012.

86.    In an email by Larry Grant dated June 29, 2012 to Kforce executives Bill Sanders and Joseph Liberatore, Mr. Grant advised them that KGS was substantially under-running its provisional rates, but advised against reporting that fact to the Federal Government for fear a large discrepancy might trigger a DCAA audit. Mr. Grant indicated his concern that such an audit would uncover other problems with KGS's finances like improper time charges in KGS' Time and Expense System. Mr. Grant indicated in that email that

> "The huge risk we face with an audit is the company being charged with 'fraudulent claims' and/or 'fraudulent reporting.' A good example of this is the negative CPAR rating we received from our DTRA customer due to four months of inaccurate invoicing. If not for the fact that KGS has a 14 year, outstanding relationship (as told us by the customer), we would be reported to the DCMA (Defense Contract Management Agency – DCAA reports to DCMA) for 'fraudulent claims' and/or 'fraudulent reporting.' We have had a similar issue with our ENSA customer and our DARPA customer.  We have not yet received a negative CPAR from ENSA or DARPA, but they have sounded the warning bell. Again, our contract performance is outstanding; our business management is poor."

## MISALLOCATION OR FRAUDULENT CONCEALMENT OF COSTS:

87.    KGS "parked" costs in KGS onsite pools to cover for KGS customer onsite rates which were increasing during fiscal years 2009 through 2011. This concealment of costs in the KGS onsite pool had the intended effect of keeping KGS customer site rates steady, allowing KGS to appear to remain cost competitive in one cost pool but resulting in higher costs in the KGS customer site pool.

88.    KGS wrote other cost overruns off expressly for the purpose of fraudulently concealing them from the Federal Government so as to continue to appear cost competitive on a critical and highly profitable contract with Defense Threat Reduction Agency (DTRA) known as HDTRA1-10-D-0001-0005, which had already

suffered from a negative Contractor Performance Assessment Report ("CPAR") as noted above.

89.    Upon information and belief, the "parking" and writing off of costs was done specifically to make KGS appear to be more cost competitive than it was, so that Kforce would increase its success at winning and keeping further Federal cost reimbursable contracts.

90.    Upon information and belief, in 2012 approximately 12-15% of KGS revenues came from cost reimbursable Federal contracts, which translates roughly to between $9 million dollars and $12 million dollars in annual revenue.

91.    Upon information and belief, during the years 2009 through the present, KGS won and maintained various cost reimbursable Federal Contracts, in part, because it falsely portrayed its costs so as to give the appearance of remaining competitive.

## DIVERSION OF ASSETS TO COMMERCIAL PURPOSES:

92.    KGS and KFORCE through their executive leadership conspired to divert assets paid for by KGS' U.S. Government customers toward commercial uses so as to benefit KFORCE, without providing a credit back to KGS.

93.    Assets purchased by government monies may not be used or diverted to private or commercial purposes or gain without a credit for the value of such use being issued back as compensation for the use of such asset.

94.    One such KGS asset was a facility in San Antonio Texas, which KFORCE used to conduct commercial recruiting activities.  KGS never conducted any recruiting activities at that facility.

95.     KFORCE used KGS to absorb startup, execution and support costs for commercial contracts and KGS providing personnel for KFORCE's commercial benefit, including an entity known as Kforce Healthcare.

96.     KFORCE never gave any credits back to KGS for its use of facilities, or KGS' absorbing startup costs or providing personnel for Kforce Healthcare.

## FAILURE TO FOLLOW CONSISTENT COST ACCOUNTING STANDARDS AND OTHER FINANCIAL CONTROLS:

97.     Defendants failed and refused to follow consistent accounting methodologies with respect to home office allocations, as required by Cost Accounting Standards ("CAS"), resulting in inaccurate invoices being issued to U.S. Government customers.  KGS' failure to make its incurred cost submissions since the inception of KGS as a legal entity (six years) has resulted in virtually every single invoice it has submitted to U.S. Government customers during the last six years being inaccurate and based on incorrect and false cost data.

98.     At Relator's insistence, KFORCE brought in a third party audit firm in or about November 2011 to assist in the development of new and accurate DCAA provisional rates.  During that audit firm's investigation, they discovered numerous and serious flaws in KGS' management of finances, financial controls, and lack of consistent financial practices.

99.     As of the date of termination of Relator's employment in December 2012, Defendants had taken no action to correct the audit firm's multiple findings, and upon information and belief, the lack of financial controls and inaccurate invoicing of the Federal Government is continuing to date.

## OVERSTATING CORPORATE VALUE
## IN FINANCIAL STATEMENTS PROVIDED TO INVESTORS:

100.    During 2010 through 2012, KFORCE intentionally overstated KGS' value by releasing false future expected profits figures, known to be unattainable.

101.    During a subsequent audit, KFORCE executive Bill Sanders instructed Relator and KGS President Larry Grant to support those false future expected profits figures in communications with auditors, which Relator refused to do.

102.    KGS was eventually forced to take an impairment of $65.3 million dollars as a result, and upon information and belief, that impairment did not adequately correct the false impression KFORCE and KGS gave, and further upon information and belief, KFORCE is currently undergoing a phase two impairment review.

103.    Relator warned KGS and KFORCE leadership that the above activities were ongoing and violated accounting standards and compliance standards applicable to KGS as a U.S. Federal contractor, KGS and KFORCE either rejected or ignored those warnings.

104.    As a result of the CAS and FAR violations alone, virtually every single invoice Defendant KGS has submitted for payment to any of its U.S. Government customers over the past five years has been false and fraudulent, and each such false invoice needs to be recalculated based upon correct DCAA rates, correct cost allocations, and/or appropriate credits made to each customer.

105.    Upon information and belief, at all relevant times Defendants acted "knowingly", as that term is defined in 31 U.S.C. §3729(b)(1) and upon information and belief had actual knowledge of each such issue no later than the dates on which Relator reported them to KGS or KFORCE.

106.    By reason of the above, KGS' use of incorrect and outdated DCAA rates for preparation of invoices submitted to U.S. Government customers constituted a false or fraudulent claim for payment or approval under 31 U.S.C. §3729(a)(1)(A) and a false record or statement material to a false or fraudulent claim under 31 U.S.C. §3729(a)(1)(B).

107.    By reason of the above, KGS' use of any financial record which incorporated one or more of KGS's incorrect cost allocations with respect to home office allocations for the preparation of invoices submitted to U.S. Government customers constituted a false or fraudulent claim for payment or approval under 31 U.S.C. §3729(a)(1)(A) and a false record or statement material to a false or fraudulent claim under 31 U.S.C. §3729(a)(1)(B).

108.    KGS' diversion of property paid for by KGS' U.S. Government customers to KFORCE for its own commercial purposes, without any credit back from KFORCE to KGS constituted possession, custody, or control of property used or to be used by the Government and further constitutes a conspiracy between KGS and KFORCE under 31 U.S.C. § 3729(a)(1)(C) and (D).

109.    KGS' actions in which it "parked" costs in KGS site pools to cover for customer site rates, thereby keeping KGS customer site rates steady, allowing KGS to appear to remain cost competitive, and actions to write off other costs expressly for the purpose of concealing them from the Federal Government, constitutes the making and use of a false record or statement material to a false or fraudulent claim under 31 U.S.C. §3729(a)(1)(B) and (G).

110.    Defendant KFORCE was at all relevant times fully aware of, consented in, cooperated with and/or controlled Defendant KGS' actions which constituted a violation of 31 U.S.C. §3729 as outlined above, and therefore conspired with KGS to commit those violations pursuant to 31 U.S.C. §3729.

111.    KGS' and KFORCE's actions in which they separately and/or conspired to terminate Relator's employment, and statements their representatives made to third parties, including the Administrative Agreement Monitor overseeing the Administrative Agreements, were meant to silence Relator's investigation and reports of issues of such fraud and false invoices and reports, and such actions constituted a cover up and false statements material to a false or fraudulent claim under 31 U.S.C. §3729(a)(1)(B)(C) and (G).

112.    Further, KGS' and Kforce's actions in which they separately and/or conspired to terminate Relator's employment, and statements their representatives made to third parties, including the Administrative Agreement Monitor overseeing the Administrative Agreements were meant to avoid having to investigate such fraud, correct all the relevant and affected invoices, avoid an audit and being required to issue credits back to the affected U.S. Government customers, and as such, constituted a false statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or avoiding or decreasing an obligation to pay or transmit money or property to the U.S. Government, under 31 U.S.C. §3729(a)(1)(B)(C) and (G).

113.    By reason of the above, one or both of Defendants KFORCE and KGS are liable to the U.S. Government for a civil penalty of not less than $5,000 and not more

than $10,000 per violation, as adjusted by the Federal Civil Penalties Adjustment Act of 1990, plus three times the amount of damages which the Government sustained, together with interest, including pre-judgment interest, and the costs of this legal action, including reasonable attorney's fees.

114.   Relator is entitled to bring this Count, and has complied with all requirements pursuant to 31 U.S.C. §3730(b).

115.   Upon any recovery for the U.S. Government, Relator is entitled to an award in an amount no less than 15% and no more than 25% in the event the United States intervenes in this action, and no less than 25% and no more than 35% in the event the United States does not intervene in this action, pursuant to 31 U.S.C. §3730(d).

## COUNT II

### RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. 3730(h)
### Against Defendants Kforce, Inc. and
### Kforce Government Solutions, Inc.

116.   On or about February 2, 2011, KGS hired Relator as an employee to serve as Strategic Development Officer and Senior Vice President, at an annual salary of $200,000 per year, plus participation in the KGS Management Bonus Pool.

117.   On or about April 10, 2012, KGS promoted Relator to the Number 2 position in the organization, bearing the title of Executive Vice President and Chief Operations Officer.  Relator's compensation was increased to $230,000 per year, and he continued his participation in the KGS Management Bonus Pool.

118.   In 2011, Relator's bonus was approximately $60,000.

119.   In 2012, had Relator not been terminated in December 2012, Relator's share of the Management Bonus Pool would have been at least $60,000.

120.   Had Relator not been terminated in December 2012, he would have received rights to an additional share of a KGS Retention Bonus pool, in the sum of approximately $960,000 as compensation for staying with KGS through Kforce's divestment of KGS.

121.   Relator did not receive any bonus for 2012.

122.   As the Executive Vice President and Chief Operations Officer, and generally the Number 2 person in KGS, Relator's mandate included investigation of issues of non-compliance, report such to KGS and recommendation actions to bring KGS fully into compliance with all Federal regulations and requirements applicable to KGS as a Federal Contractor.

123.   During the course of Relator's employment with KGS, Relator uncovered and reported to Defendants ongoing, systemic violations of FAR and CAS;  repeated instances of misallocation of costs, misuse and wrongful diversion to and possession of property paid for by U.S. Government customers by KFORCE, for commercial purposes without appropriate credits; the Defendants' failure to annually update their DCAA rates and the consequent ongoing use of inaccurate DCAA rates, and other lack of use of financial controls, such that virtually every single invoice KGS has ever sent to any U.S. Government customer presented a false or fraudulent claim for payment or approval, or that such invoices, cost allocations and reports, and DCAA rates consisted of false records or statements material to a false or fraudulent claim.

124.    Relator's investigation and reports to KGS and Kforce constituted lawful acts by Relator as an employee of KGS in an effort to stop one or more of such incidents, which constituted violations of the False Claims Act.

125.    Relator's investigation and reports placed a great deal of pressure upon KGS' Finance Department in particular because of the increased work necessary in correcting the myriad accounting problems uncovered by Relator.

126.    Upon information and belief, in late November 2012, KGS' Chief Financial Officer Dave Kelly met with KGS President Larry Grant and demanded that Relator be terminated because Relator was too challenging and Relator's warnings and demands that financial improprieties and various violations of CAS and FAR be corrected irritated his financial team.

127.    Upon information and belief, Larry Grant refused to terminate Relator, replying that Relator was doing his job.

128.    Upon information and belief, on or about December 6, 2012 David Dunkel (Kforce CEO), Joe Liberatore (Kforce President), David Kelly (Kforce CFO, and previously was Director of Finance) and Bill Sanders (Kforce Vice Chairman of Board of Directors met to discuss terminating Relator's employment.  Notably absent from the meeting were any executive officers or Board members from KGS.

129.    Subsequently, on or about December 6, 2012 Kforce President William Sanders, in a meeting with KGS President Larry Grant and Kforce General Counsel Bill Josey, stated that although Relator had done nothing wrong, and only had been doing his job to correct compliance issues at KGS, that Larry Grant was to fire Relator, and if Grant did not fire Relator, then Grant would himself be fired.

130. Upon information and belief, Larry Grant again refused to terminate Relator as there were no adequate grounds to do so.

131. Upon information and belief, Defendant KFORCE instructed Bill Josey to fire Relator "on behalf of" KGS and Larry Grant, but without Larry Grant's knowledge or consent.

132. On or about December 7, 2012, Defendants terminated Relator, in a telephone conference between Relator, Bill Josey (Kforce's General Counsel) and Robin Roett (Kforce's Director of Human Resources) and agreed to pay his existing salary through to the end of that month, December 31, 2012. Relator was not to receive any bonuses or severance pay.

133. At the time of termination, Bill Josey informed Relator he was being terminated for cause.

134. At the time of termination, Bill Josey informed Relator he was being terminated as the result of information uncovered during compliance oversight activities.

135. At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator's actions were allegedly jeopardizing KGS' performance under the Administrative Agreements.

136. At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator's actions were in opposition to the requirements of the Administrative Agreements.

137. At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator failed to implement a close integration of the Compliance Officer into Relator's leadership team.

138.    At the time of termination, Bill Josey informed Relator that he had been "authorized" to terminate Relator's position.

139.    At the time of termination, Bill Josey informed Relator that Defendant KGS's President, Larry Grant knew about the termination and authorized it.

140.    Upon information and belief, after Relator's termination, one or more representatives of Defendants informed the Administrative Agreement Monitor overseeing compliance with KGS' Administrative Agreements that Relator had been terminated due to lack of performance, compliance related issues and violation of the provisions of the Administrative Agreements.

141.    Upon information and belief, after Relator's termination, one or more representatives of Defendants informed third parties and persons employed and active in the Federal Contracting industry and community that Relator had been terminated a) by Larry Grant personally; b) for performance reasons; c) for compliance related reasons; and d) that Relator was personally being considered for debarment from any future Federal contracting work.

142.    Upon information and belief, no "compliance oversight activities", or other good faith investigation had taken place into Relator's performance prior to termination of Relator's employment.

143.    Upon information and belief, Bill Josey had not been authorized by Defendant KGS to terminate Relator, but rather was following the instructions of Defendant KFORCE.

144.    Upon information and belief, at the time Bill Josey told Relator he was fired, no one had informed KGS executive leadership, or the KGS Board of Directors, nor had anyone at KGS authorized Relator's termination.

145.    Upon information and belief, the decision to terminate Relator was in retaliation for, and to prevent the making of further objections and warnings regarding Defendants' non-compliance, false and fraudulent invoicing of U.S. Government departments and agencies, false and fraudulent accounting practices, false and fraudulent cost allocation practices, diversion of assets paid for by U.S. Government customers to commercial purposes without appropriate credits, and Relator's refusal to provide or support false projections of expected future profits for KGS to auditors.

146.    The purported reasons given for Relator's termination are not only false, fraudulent and defamatory, but were developed, upon information and belief, for the express purpose of covering up the real reasons for Relator's termination, which was to silence Relator and prevent his continued investigations and reports of ongoing instances of non-compliance.

147.    Defendants' termination of Relator's employment constituted a retaliatory action under 31 U.S.C. 3730(h), in that Relator was discharged because of lawful acts performed by Relator as an employee in furtherance of efforts to stop one or more violations of the False Claims Act.

148.    Defendants are jointly and severally liable to Relator for damages, including injunctive relief, Relator's reinstatement to his position with the same seniority status he would have had but for the termination, double the amount of lost back pay, including lost bonuses he would have received, including the annual management pool

bonus and the KGS Retention Bonus, and compensation for special damages sustained as a result of the termination which includes lost future income by reason of Relator's difficulties in obtaining other, similar employment for a Federal contractor, damages related to injuries done to Relator's personal and business reputation in connection with the false and derogatory reasons Defendants published for Relator's termination, emotional pain and suffering Relator suffered upon and because of  his summary termination, leaving him without the ability to obtain other, similar employment, plus reasonable attorneys and costs of this action,  together with such other and further relief as this Court deems just and proper.

## COUNT III

### FLORIDA WHISTLEBLOWER ACT
### FLA. STAT. §448.102 et. seq.
### Against Defendants Kforce, Inc. and
### Kforce Government Solutions, Inc.

149.    On or about February 2, 2011, KGS hired Relator as an employee to serve as Strategic Development Officer and Senior Vice President, at an annual salary of $200,000 per year, plus participation in the KGS Management Bonus Pool.

150.    On or about April 10, 2012, KGS promoted Relator to the Number 2 position in the organization, bearing the title of Executive Vice President and Chief Operations Officer.   Relator's compensation was increased to $260,000 per year, and he continued his participation in the KGS Management Bonus Pool.

151.    In 2011, Relator's bonus was approximately $60,000.

152.    In 2012, had Relator not been terminated in December 2012, Relator's share of the Management Bonus Pool would have been at least $60,000.

153.   Had Relator not been terminated in December 2012, he would have received rights to an additional share of a KGS Retention Bonus pool, in the sum of approximately $960,000 as compensation for staying with KGS through KFORCE's divestment of KGS, which Relator intended to do.

154.   Relator did not receive any bonus for 2012.

155.   As the Executive Vice President and Chief Operations Officer, and generally the Number 2 person in KGS, Relator's mandate included the investigation of issues of non-compliance, report such to KGS and recommend actions to bring KGS fully into compliance with all Federal regulations and requirements applicable to KGS as a Federal Contractor.

156.   During the course of Relator's employment with KGS, Relator uncovered and reported, in writing, including emails, to Defendants ongoing, systemic violations of FAR and CAS, and repeated instances of misallocation of costs, misuse and wrongful possession of property paid for by U.S. Government customers for use by KFORCE, for commercial purposes without appropriate credits, the ongoing use of inaccurate DCAA provisional rates, and other lack of financial controls such that virtually every single invoice KGS has ever sent to any U.S. Government customer, and would continue sending until such issues were resolve, was incorrect.

157.   Relator objected to these activities and practices, refused to participate in them, disclosed or threatened to disclose these violations, and in fact did make at least some of them known, to the Administrative Agreement Monitor supervising the Administrative Agreements to which KGS was a party.

158.   Such disclosures and threats to disclose constitute the disclosure or threat of disclosure to an appropriate governmental agency of an activity, policy or practice of KGS that is a violation of law, rule, or regulation pursuant to Fla. Stat. §448.102(1); and further constituted the providing of information to an appropriate governmental agency conducting an investigation into an alleged violation of law, rule, or regulation by KGS pursuant to Fla. Stat. §448.102(2). Further, Relator had objected and refused to participate in such activities and practices under Fla. Stat. § 448.102(3).

159.   Relator's written reports to senior staff, members of the Board of Directors, and senior executive level personnel at the parent company KFORCE, constituted a disclosure of such activities, policies and practices to the attention of a supervisor, pursuant to Fla. Stat. § 448.102(1), and such supervisors, including KFORCE had a reasonable opportunity to correct such activities, policies and practices.

160.   During 2011 and at least part of 2012, upon information and belief, KFORCE intentionally overstated KGS' value (KGS is KFORCE's subsidiary) by releasing false future expected profits figures, known to be unattainable.

161.   During a subsequent audit, Defendant KFORCE instructed Relator to submit false information or otherwise support those false future expected profits figures in communications with the auditors.

162.   Relator refused to provide false information to the auditors, or to support false information provided by KFORCE and indicated that he would tell the auditors the truth, which was a much lower expected profits number.

163.   As a result of Relator's refusal to provide false information to auditors, or to support false information provided by KFORCE, Defendants were forced to take an

impairment of $65.3 million dollars, and upon information and belief, that impairment did not adequately correct the false impression KFORCE gave, and further upon information and belief, KFORCE is currently undergoing a phase two impairment review.

164.    Relator's refusal to provide false information to auditors, or to support false information provided by Defendants, and his threat to tell the auditors the truth (who would in turn require corrective reports to be submitted to the Securities and Exchange Commission) constitutes an objection or refusal to participate in an activity, policy or practice of the employer which is a violation of a law, rule or regulation, and a threat to disclose such activity, policy or practice to an appropriate governmental agency.

165.    Relator's investigation and reports placed a great deal of pressure upon KFORCE's Financial Department in particular because of the increased work necessary in correcting the myriad accounting problems uncovered by Relator.

166.    Relator's refusal to submit or support false financial information provided to auditors caused Defendant KFORCE to take an impairment of value of $65.3 million dollars, and potentially to undergo a subsequent impairment of value as, upon information and belief, KFORCE is undergoing a phase 2 impairment review.

167.    Upon information and belief, in late November 2012, KGS' Chief Financial Officer Dave Kelly met with KGS President Larry Grant and demanded that Relator be terminated because Relator was too challenging and Relator's warnings and demands that financial improprieties and various violations of CAS and FAR be corrected irritated his financial team.

168.    Upon information and belief, Larry Grant refused to terminate Relator, replying that Relator was doing his job.

169.    Upon information and belief, on or about December 6, 2012 David Dunkel (Kforce CEO), Joe Liberatore (Kforce President), David Kelly and Bill Sanders (Kforce Vice Chairman of Board of Directors met to discuss terminating Relator's employment. Notably absent from the meeting were any executive officers or Board members from KGS.

170.    Subsequently, in or about December 6, 2012 Kforce President William Sanders, in a meeting with KGS President Larry Grant and Kforce General Counsel Bill Josey, stated that although Relator had done nothing wrong, and only had been doing his job to correct compliance issues at KGS, Larry Grant was instructed to fire Relator, and if Grant did not fire Relator, then Grant would in turn be fired.

171.    Upon information and belief, Larry Grant refused to terminate Relator as there were no adequate grounds to do so.

172.    Upon information and belief, Defendant KFORCE instructed Bill Josey to fire Relator "on behalf of" Larry Grant, but without Larry Grant's knowledge or consent.

173.    On or about December 7, 2012, KFORCE terminated Relator, in a telephone conference between Relator, Bill Josey (Kforce's General Counsel) and Robin Roett (Kforce's Director of Human Resources) and agreed to pay his existing salary through to the end of that month, December 31, 2012.

174.    At the time of termination, Bill Josey informed Relator he was being terminated for cause.

175.    At the time of termination, Bill Josey informed Relator he was being terminated as the result of information uncovered during compliance oversight activities.

176.    At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator's actions were allegedly jeopardizing KGS' performance under the Administrative Agreements.

177.    At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator's actions were in opposition to the requirements of the Administrative Agreements.

178.    At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator failed to implement a close integration of the Compliance Officer into Relator's leadership team.

179.    At the time of termination, Bill Josey informed Relator that he had been "authorized" to terminate Relator's position.

180.    At the time of termination, Bill Josey informed Relator that Defendant KGS's President, Larry Grant knew about the termination and authorized it.

181.    Upon information and belief, after Relator's termination, one or more representatives of Defendants informed the Administrative Agreement Monitor overseeing compliance with KGS' Administrative Agreements that Relator had been terminated due to lack of performance, compliance related issues, and violation of the provisions of the Administrative Agreements.

182.    Upon information and belief, after Relator's termination, one or more representatives of Defendants informed third parties and persons employed and active in the Federal Contracting industry and community that Relator had been terminated a) by

Larry Grant personally; b) for performance reasons; c) for compliance related reasons; and/or d) that Relator was personally being considered for debarment from any future Federal contracting work.

183.   Upon information and belief, no "compliance oversight activities", or other good faith investigation had taken place into Relator's performance prior to termination of Relator's employment.

184.   Upon information and belief, Bill Josey had not been authorized by Defendant KGS to terminate Relator, but rather was following the instructions of Defendant KFORCE.

185.   Upon information and belief, at the time Bill Josey told Relator he was fired, no one had informed KGS executive leadership, or the KGS Board of Directors, nor had anyone at KGS authorized Relator's termination.

186.   Upon information and belief, the decision to terminate Relator was in retaliation for, and to prevent the making of further objections and warnings regarding Defendants' non-compliance, false and fraudulent invoicing of U.S. Government departments and agencies, false and fraudulent accounting practices, false and fraudulent cost allocation practices, diversion of assets paid for by U.S. Government customers to commercial purposes without appropriate credits, and in retaliation for Relator's refusal to submit false information or to support false information submitted by Defendant KFORCE to auditors.

187.   The purported reasons given for Relator's termination are not only false, fraudulent and defamatory, but were developed, upon information and belief, for the express purpose of covering up the real reasons for Relator's termination, which was to

silence Relator and prevent his continued investigations and reports of ongoing instances of non-compliance.

188.    Defendants' termination of Relator's employment constituted a retaliatory action under Fla. Stat. §448.102 because Relator was discharged because he had disclosed and/or threatened to disclose to the Administrative Agreement Monitor overseeing the Administrative Agreements between KGS and the U.S. Department of the Interior, of activities, policies and practices which were a violation of law, rule, or regulation under §448.102(1); because Relator had provided information to the Administrative Agreement Monitor overseeing the Administrative Agreements under §448.102(2); and because Relator had objected to or refused to participate in any of such activities, including providing false information or supporting false information previously provided to auditors under §448.102(3).

189.    Defendants are jointly and severally liable to Relator for damages, including injunctive relief, Relator's reinstatement to his position with the same seniority status he would have had but for the termination, lost back pay, including lost bonuses he would have received, including the KGS Retention Bonus, lost benefits and other remuneration and compensation, and compensatory damages including lost future income and bonuses by reason of Relator's difficulties in obtaining other, similar employment, damages related to injury done to Relator's personal and business reputation connected with the false and derogatory reasons Defendants published for Relator's termination, plus reasonable attorneys and costs of this action, together with such other and further relief as this Court deems just and proper.

## COUNT III

**COMMON LAW DEFAMATION**
**(Slander and Libel)**
**Against Defendants Kforce, Inc. and**
**Kforce Government Solutions, Inc.**

190.    Throughout Relator's employment with Defendant KGS, he received repeated exemplary performance evaluations and positive comments regarding the performance of his duties.

191.    Relator has never been warned, reprimanded, reproved or criticized in any way for the manner in which he performed his duties, or for compliance related issues, while with Defendant KGS.

192.    On or about December 7, 2012, KGS terminated Relator, in a telephone conference between Relator, Bill Josey (Defendant Kforce, Inc's General Counsel) and Robin Roett (Defendant Kforce, Inc.'s Director of Human Resources and agreed to pay his existing salary through to the end of that month, December 31, 2012.

193.    Relator was not given any bonuses earned for 2012 and did not receive any severance pay.

194.    At the time of termination, Bill Josey informed Relator he was being terminated for cause.

195.    At the time of termination, Bill Josey informed Relator he was being terminated as the result of information uncovered during compliance oversight activities.

196.    At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator's actions were allegedly jeopardizing KGS' performance under the Administrative Agreements.

197.   At the time of termination, Bill Josey stated that Defendants were in possession of information that that Relator's actions were in opposition to the requirements of the Administrative Agreements.

198.   At the time of termination, Bill Josey stated that Defendants were in possession of information that Relator failed to implement a close integration of the Compliance Officer into Relator's leadership team.

199.   At the time of termination, Bill Josey informed Relator that he had been "authorized" to terminate Relator's position.

200.   At the time of termination, Bill Josey informed Relator that Defendant KGS's President, Larry Grant knew about the termination and authorized it.

201.   Upon information and belief, after Relator's termination, one or more representatives of Defendants informed the Administrative Agreement Monitor overseeing compliance with KGS' Administrative Agreements that Relator had been terminated due to lack of performance, compliance related issues, and violation of the provisions of the Administrative Agreements.

202.   Each of those statements constituted a publication of such statement at least to Robin Roett, Director of Human Resources and to the Administrative Agreement Monitor.

203.   Upon information and belief, after Relator's termination, one or more representatives of Defendants informed one or more third parties and persons employed and active in the Federal Contracting industry and community, and informed the Administrative Agreement Monitor supervising compliance with the Administrative Agreements that Relator had been terminated a) by Larry Grant personally; b) for

performance reasons; c) for compliance related reasons; and/or d) that Relator was personally being considered for debarment from any future Federal contracting work (hereafter "Defamatory Communications").

204. Upon information and belief, no "compliance oversight activities", or other good faith investigation had taken place into Relator's performance prior to termination of Relator's employment.

205. Upon information and belief, Bill Josey had not been authorized by Defendant KGS to terminate Relator, but rather was following the instructions of Defendant KFORCE.

206. Upon information and belief, the decision to terminate Relator was made by executive leadership of Defendant KFORCE.

207. Upon information and belief, the decision to terminate Relator was in retaliation for, and to prevent the making of further objections and warnings regarding Defendants' non-compliance, false and fraudulent invoicing of U.S. Government departments and agencies, false and fraudulent accounting practices, false and fraudulent cost allocation practice, diversion of assets paid for by U.S. Government customers to commercial purposes without appropriate credits, and Relator's refusal to participate in providing or support false financial information to auditors.

208. Upon information and belief, the reasons Defendants gave for Relator's termination were false, and were made for the express purpose of covering up the real reasons for Relator's termination, which was to silence his efforts to bring KGS into full compliance with FAR, CAS and other requirements applicable to KGS as a Federal Contractor.

209.    On December 7, 2012, the same day he was terminated, Relator received a

text message from a former KGS employee named John Crapo which stated:

> "Humm, this will be an interesting case study to see how a liar, cheat and
> thief survives in a closed small community lands [sic]. Tampa knows who
> and what you are, as does the Government contracting circles. Quite the
> somber Opus, wouldn't you say? Emails are flying around talking about
> this. You had quite the following waiting for this day. We'll be watching
> to see if you land -- it won't be soft."

210.    Upon information and belief on or about December 7, 2012 Defendants

informed one or more third parties, including former employee John Crapo, that Relator

had been terminated for cause, for performance related reasons, for compliance related

reasons, for violations of the Administrative Agreements, and otherwise indicating that

Relator was a "liar, cheat and thief".

211.    Upon information and belief, on or about December 7, 2012, emails "were

flying around talking about" Relator's termination and the reasons Defendants gave for

that termination, and Defendants and their employees were otherwise spreading word

regarding Relator's termination and the defamatory reasons for such termination.

212.    Upon information and belief, Defendants knew that the Federal

contracting community was "a closed small community" in which word of Relator's

termination, and the reasons therefore would rapidly spread.

213.    Soon after his termination, as predicted by former KGS employee John

Crapo, Relator received over a dozen unsolicited communications from other members of

the small and tightly knit Federal Contracting industry indicating that they had received

information that Relator had been terminated for performance problems, compliance

concerns and in at least one case that Relator himself was being considered for debarment

from future Federal Contracting work.

214.     Among the persons who contacted Relator to indicate that they had heard such reports are: Frank Beaty, employed with Oak Grove Technologies; Paul Kennett and Stone Davis employed with Kastellum Group, Brooke Citrano employed with Red Arch Solutions, Keith Griffin, Tristan Bannon, Jill Carney, Karen Bell, Graham Palmer, Joe Rhodes and Pete Morneau all then employed with Defendant KGS.

215.     Upon information and belief, the more than a dozen contacts Relator has received is only a part or fraction of those who have received similar false allegations about Relator, but who did not choose to contact Relator.

216.     Upon information and belief, such allegations originated from Defendants Kforce and KGS and their employees.

217.     Subsequent to his termination, Relator applied for a number of new jobs with other companies. At least seven companies, ManTech International, Camber Corporation, CACI, VTC Aerospace, Boeing, Lockheed Martin and Northrup Grumman contacted Relator and informed him that they could not offer him employment because of information obtained during employment verification when they contacted Defendants

218.     Upon information and belief, Defendants informed such prospective employers that Relator had been terminated for cause, performance reasons, for non-compliance reasons, and for violating the terms of the Administrative Agreements.

219.     Upon information and belief, Defendants have repeated similar Defamatory Communications to some or all companies that have contacted Defendants to confirm employment information for Relator.

220.     Each email, text message, social media posting or message, memorandum or correspondence or other written communication, or verbal communication by either of

Defendants or their employees containing any of the Defamatory Communications, constituted a publication of such comment.

221.    Each and every one of the Defamatory Communications was and is false.

222.    Defendants have, upon information and belief, also verbally published one or more of the Defamatory Communications, including at least that Relator was terminated for performance reasons, for non-compliance reasons, and for violating the terms of the Administrative Agreements, and such verbal communications were made to, at the very least, the Administrative Agreement Monitor in charge of supervising KGS' compliance with the Administrative Agreements, but upon information and belief were made to others as well, including prospective employers asking for employment verification.

223.    Upon information and belief, each such publication of any of the Defamatory Communications may and did lead to a cascade of other, secondary and tertiary communications within the close and tightly knit Federal Contracting community, both in written and verbal form, which caused additional damages to Relator's personal and business reputation.

224.    Even to the extent Defendants communicated that Relator had been terminated, that literally true statement had, upon information and belief, a defamatory effect by creating a false impression that Relator had been a less than adequate employee.

225.    Upon information and belief, all of the Defamatory Communications originally came from a representative of Defendants who knew such statements were false, or had a reckless disregard as to the falsity of such statements, or such statements were made with a negligent disregard for whether they were true or false.

226.     Defendants knew or should have known that such Defamatory Communications would be repeated and disseminated throughout the small and closely knit Federal Contracting community and amongst Government agencies who enter into such contracts.

227.     Relator has suffered actual damages as a result of publication of the Defamatory Communications, including damage to his personal and business reputation, limitations the Defamatory Communications have placed on Relator's ability to obtain other, similar employment, loss of income, bonuses, prestige, and future and better employment opportunities, as well as special damages including Relator's personal mental and emotional anguish and suffering, and his personal humiliation, and Relator is also entitled to punitive damages, in an amount to be determined at trial.

228.     Because the Defamatory Communications affect Relator's business reputation, and allege conduct incompatible with the proper exercise of lawful business, Relator has shown sufficient special damages, and such Defamatory Communications constitute Defamation per se, and Defendants are therefore liable at least for nominal damages.

## COUNT IV

### PIERCING THE CORPORATE VEIL
### (against Defendant Kforce)

229.     Plaintiffs repeat and reallege each and every allegation made above, as if more fully stated at length herein.

230.     Relator was an employee of Defendant KGS.

231.   Defendant KGS is a wholly owned subsidiary of Kforce Government Holdings, Inc., which in turn is a wholly owned subsidiary of Defendant KFORCE.

232.   Defendant KFORCE controls Defendant KGS.

233.   Defendant KFORCE performs all financial and accounting functions for KGS including management and administration of all KGS and KFORCE regulatory and compliance related activities.

234.   Defendant KFORCE controlled Defendant KGS in the manner in which it responded to or rejected Relator's warnings regarding non-compliance.

235.   Defendant KFORCE controlled Defendant KGS when it instructed Relator to provide false financial information or support false financial information to KFORCE's auditors.

236.   Defendant KFORCE threatened KGS President Larry Grant and attempted to force him to terminate Relator's employment despite admitting there were no grounds for termination.

237.   When KGS President Larry Grant refused to terminate Relator because there were no grounds to do so, Defendant KFORCE proceeded to terminate Relator itself, without the procedures of obtaining consent from executive leadership at KGS, or the KGS Board of Directors.

238.   Upon information and belief, the executive Leadership of KGS and the KGS Board of Directors did not know of Relator's termination until after he had been terminated.

239.   Defendant KFORCE controlled Defendant KGS in terminating Relator's employment.

240.    Defendant KFORCE controlled Defendant KGS in determining and publishing the purported and defamatory reasons for Relator's termination.

241.    Defendant KFORCE ignored the corporate formalities of permitting KGS executive leadership and the KGS Board of Directors to make the decision regarding Relator's termination.

242.    At the time Relator was terminated, Defendant KFORCE had made the decision to divest itself of KGS.

243.    Because KFORCE was planning on divesting itself of KGS, it wanted to keep the perceived value of KGS as high as possible.

244.    Upon information and belief, at least part of the reason for terminating Relator's employment was to protect the perceived valuation of KGS and to protect Defendant KFORCE's stock price.

245.    Upon information and belief, at least part of the reason for terminating Relator's employment was to assist in misleading potential purchasers of KGS stock as KFORCE divested itself of that subsidiary.

246.    Defendant KGS is in actuality the alter ego of Defendant KFORCE.

247.    Defendant KFORCE leveraged KGS for the intended purpose · augmentation of revenues for KFORCE business unit known as Kforce Federal Staffing (KFS), with costs for obtaining that work being allocated to KGS.

248.    Defendant KFORCE treated KGS as a mere device or sham to accomplish its own corporate purposes, for ulterior purposes, to evade liability and expense to correct and compensate for fraudulent and false invoices and fraudulent and false accounting

practices at KGS, including the termination of Relator's employment and the cover-up of the true reasons for such termination.

249.    KGS' termination of Relator's employment, and its publication of false and defamatory reasons for such termination were wrong and improper.

250.    KFORCE's direct control over the decision to terminate Relator, and the decision to publish false reasons for such termination constituted the use and control of its subsidiary to accomplish an improper purpose.

251.    By reason of the above, Defendant KFORCE should be made liable for KGS's obligations with respect to each and every Count in this Complaint.

WHEREFORE the Plaintiffs seek damages against Defendants, KFORCE GOVERNMENT SOLUTIONS, INC., and KFORCE, INC., attorney's fees and costs, and any such further relief this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Edmund J. Gegan
FBN: 0068822
Archer Bay, P.A.
2639 Dr. MLK Jr. Street North
St. Petersburg, FL 33705
Telephone (800) 934-5999
Fax:  866) 984-5329
Email: egegan@archerbay.com

6/6/2013