UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

USA and WILLIAM TURNER,

    Plaintiffs,

v.                                          Case No: 8:13-cv-1517-T-36TBM

KFORCE GOVERNMENT SOLUTIONS,
INC. and KFORCE, INC.,

    Defendants.
_____/

## **O R D E R**

This matter comes before the Court upon the Defendants' Motion to Dismiss Amended Complaint (Doc. 24). Plaintiff filed a timely response and a hearing was held on August 26, 2014. The Court, having considered the motion and being fully advised in the premises, will grant Defendants' Motion to Dismiss Amended Complaint.

### *I.     Plaintiff's Factual Allegations[1]*

Plaintiff William Turner was formerly employed by Defendant KForce Government Solutions, Inc. ("KGS") as its Executive Vice President and Chief Operations Officer. Doc. 18 at ¶ 7. KGS is a wholly owned subsidiary of KForce Government Holdings, Inc., which in turn is a wholly owned subsidiary of Defendant KForce, Inc. ("KFORCE"). *Id.* at ¶ 11. KGS earns most, if not all, of its revenue from contracting work with the United States government, through one or more of its departments and agencies. *Id.* at ¶ 12.

---

[1] The facts are presented as alleged by Plaintiff because "[w]hen considering a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all of the plaintiff's [factual] allegations as true, construing them in the light most favorable to the plaintiff." *Sallah ex rel. MRT LLC v. Worldwide Clearing LLC,* 860 F. Supp. 2d 1329, 1333 (S.D. Fla. 2011) *citing Pielage v. McConnell,* 516 F. 3d 1282, 1284 (11th Cir. 2008).

On or about December 15, 2009, KGS was suspended from participating in new and renewed Federal government business and was thereafter proposed to be "debarred" from doing Federal contracting work. *Id.* at ¶ 13. On or about December 29, 2009, KGS entered into an Administrative Agreement with the United States Department of the Interior, which terminated KGS' suspension and resulted in KGS no longer being considered for debarment. *Id.* at ¶ 14. As a condition of that Administrative Agreement, KGS was required to return $78,892.32 to the Department of the Interior, and to enhance its existing compliance programs, training and controls. *Id.* at ¶ 14. The Administrative Agreement had a term of 3 years. *Id.* at ¶ 14. However, it was amended and extended through September 30, 2013 due to a continued lack of completeness of a compliance program as determined by the Monitor and the Department of Interior. *Id.* at ¶ 15.

Under the Administrative Agreements, a third party Monitor was appointed to supervise compliance with the Agreements (hereinafter "the Monitor"). *Id.* at ¶ 17. The KGS Compliance Program is administered by KFORCE, through KFORCE associates and leaders, on behalf of KGS. *Id.* at ¶ 15.

On or about February 2, 2011, KGS hired Plaintiff/Relator William Turner to serve as its Strategic Development Officer and Senior Vice President, at an annual salary of $200,000 per year, plus participation in the KGS Management Bonus Pool. *Id.* at ¶ 18. Turner was hired due to his sales, delivery and strategic planning experience including his understanding of Federal compliance issues and KGS's need to come into full compliance with the Administrative Agreements. *Id.* at ¶ 19. On or about April 10, 2012, KGS promoted Turner to Executive Vice President and Chief Operations Officer. *Id.* at ¶ 20. Turner's compensation was increased to $230,000 per year, and he continued his participation in the KGS Management Bonus Pool. *Id.* at ¶ 20. In his new role, Turner's mandate was to ensure KGS was compliant with all Federal

regulations and requirements applicable to KGS as a Federal contractor in addition to other duties assigned. *Id.* at ¶ 21. During the course of Turner's employment with KGS, he identified numerous areas in which KGS was not in compliance with a variety of requirements applicable to federal contractors. *Id.* at ¶ 22.

Indirect Cost Formulations are used by Federal Contracting Officers' auditors to forecast the contractors' rates (provisional or final) on all contracts and are meant to closely approximate what contractors anticipate their actual cost rates will be for that upcoming year. *Id.* at ¶ 26. Contractors are required to monitor their actual costs, compare them to final or Provisional Rates and throughout accounting periods, "true up" or adjust their invoices to the Federal Government accordingly. *Id.* at ¶ 26. Incurred cost submissions and requests for Provisional Rates are required to be submitted in accordance with the Federal Acquisition Regulations ("FAR"). *Id.* at ¶ 26. If a Contractor's actual cost rates are lower that their final or Provisional Rates, the contractor owes money back to the Federal Government. *Id.* at ¶ 27. If a Contractor's actual cost rates are higher than their final or Provisional Rates, a supplemental invoice must be provided to the Federal Government, and a large discrepancy between actual and Provisional Rates may cause the Federal Government and/or the Defense Contract Audit Agency ("DCAA") to conduct an audit to determine the reason for the lack of financial management. *Id.* at ¶ 28.

Turner alleges that KGS's violations of FAR included KGS's failure to submit revised provisional rates from 2009 through 2011 and, as a result, using 2009 provisional rates throughout 2009, 2010 and 2011. *Id.* at ¶ 23.

Turner first identified this issue to Defendants in or about June 2011, and thereafter this issue was addressed numerous times in emails, in meetings with the boards of directors, and meetings with Defendants' executive leaders. *Id.* at ¶ 24. However, Defendants were already aware

of KGS's improper continued use of 2009 provisional rates prior to commencement of Turner's employment. *Id.* at ¶ 25. Defendants responded to concerns over inaccurate DCAA final or provisional rates by assigning inexperienced project analysts, resulting in many inaccuracies in KGS's 2012 Provisional Rate Submittal. *Id.* at ¶ 29.

In an email by KGS President Larry Grant dated June 29, 2012 to KFORCE executives Bill Sanders and Joseph Liberatore, Grant advised that KGS was substantially under-running its provisional rates, but advised against reporting that fact to the Federal Government for fear a large discrepancy might trigger a DCAA audit. *Id.* at ¶ 32. Mr. Grant indicated his concern that such an audit would uncover other problems with KGS's finances, such as improper time charges in KGS' Time and Expense System. *Id.* at ¶ 32.

KGS had "parked" costs in KGS onsite pools to cover for KGS customer onsite rates which were increasing during fiscal years 2009 through 2011. *Id.* at ¶ 33. This concealment of costs in the KGS onsite pool had the intended effect of keeping KGS customer site rates steady, allowing KGS to appear to remain cost competitive in one cost pool but resulting in higher costs in the KGS customer site pool. *Id.* at ¶ 33. Further, KGS wrote off other cost overruns expressly for the purpose of fraudulently concealing them from the government so as to continue to appear cost competitive on a critical and highly profitable contract with the Defense Threat Reduction Agency (DTRA) known as HDTRA1-10-D-0001-0005, which had already received a negative Contractor Performance Assessment Report ("CPAR"). *Id.* at ¶ 33.

Since inception of KGS, KFORCE has concealed and/or misappropriated home allocation costs in order to be price competitive and at its discretion, cover KFORCE commercial costs across its corporate holdings which include KGS. *Id.* at ¶ 37.

4

KGS and KFORCE, through their executive leadership, conspired to divert KGS assets, paid for by its U.S. Government customers, toward commercial uses so as to benefit KFORCE, without providing a credit back to KGS. *Id.* at ¶ 38. Assets purchased by government monies may not be used or diverted to private or commercial purposes or gain without a credit for the value of such use being issued back as compensation for the use of such asset. *Id.* at ¶ 39. One such KGS asset was a facility in San Antonio Texas, which KFORCE used to conduct commercial recruiting activities; including the use of all facilities, assets and office equipment. *Id.* at ¶ 40.

Another instance of diversion of KGS assets involved KFORCE's use of KGS to absorb startup, execution and support costs for commercial contracts and KGS providing personnel for KFORCE's commercial benefit. *Id.* at ¶ 41. KFORCE never gave any credits back to KGS for its use of facilities, or KGS' absorbing startup costs or providing personnel for KFORCE commercial endeavors. *Id.* at ¶ 42. Turner believes that KFORCE and KGS did not separately account for KGS expenses incurred which related to KFORCE's commercial endeavors. *Id.* at ¶ 43.

Those costs therefore were included in KGS general overhead and administrative costs, and became part of KGS's "indirect costs", which in turn were charged to, and paid by the Federal government through KGS's government contracts. *Id.* at ¶ 43. Turner frequently attempted to persuade KFORCE and KGS to separately account for such KGS costs incurred for primarily private commercial work, so as to segregate them from KGS indirect costs, but without success. *Id.* at ¶ 44. The end result of this activity was to "siphon off" KFORCE's costs for engaging in pursuing, bidding on, winning and performing private commercial work, while keeping the revenues of such work within KFORCE. *Id.* at ¶ 45. Those siphoned off commercial costs then became part of KGS' indirect costs, and were billed to, and paid by the Federal government, leading to the United States government effectively subsidizing the costs of KFORCE's

commercial contracts. *Id.* at ¶ 45. KFORCE and KGS engaged in this "siphoning off" of costs with respect to contracts with KFORCE commercial customers including USAA, British Petroleum, and Washington Metro Transit Authority. *Id.* at ¶ 46. Turner estimates that the costs KGS incurred in pursuing these contracts was approximately $10 million dollars. *Id.* at ¶ 46.

KFORCE eventually created a division called Kforce Professional Solutions for the express purpose of using KGS assets and personnel to perform commercial work, which was billed out through KFORCE, the costs of which were included in KGS' indirect costs and were improperly billed to, and paid by the United States government. *Id.* at ¶ 47. KFORCE and KGS incurred many more costs pursuing and bidding upon other contracts which KFORCE did not win, yet those costs also became part of KGS's indirect costs, and were improperly billed to, and paid by the Federal government. *Id.* at ¶ 48.

Turner alleges that Defendants have violated Cost Accounting Standards ("CAS") through their failure and refusal to follow consistent accounting methodologies with respect to home office allocations, resulting in inaccurate invoices being issued to U.S. Government customers. *Id.* at ¶ 50. Defendants' failure to make accurate incurred cost submissions since the inception of KGS as a legal entity has resulted in virtually every single invoice it has submitted to U.S. Government customers during the last six years being inaccurate and based on incorrect and false cost data. *Id.* at ¶ 50.

At Turner's insistence, KFORCE brought in a former retired and independent DCAA auditor in or about July 2012 to assist KFORCE in identifying and noting corrective actions for its financial organization, systems and processes. *Id.* at ¶ 51. During that audit, the auditor found flaws in practices and processes, however, the auditor was not granted access to the actual financial numbers. *Id.* at ¶ 51. At Turner's insistence, KFORCE brought in a third party audit firm in or

6

about November of 2012 to assist in the development of new and accurate DCAA provisional rates. *Id.* at ¶ 52. During that audit firm's investigation, they discovered numerous and serious flaws in KGS' management of finances, financial controls, and lack of consistent financial practices. *Id.* at ¶ 52.

Turner provided updates of the lack of financial controls and violations to KGS's Board of Directors and KFORCE executive leadership during executive and Board of Director quarterly meetings. *Id.* at ¶ 53. In or about June 2012, KFORCE CEO David Dunkel presented himself to KGS Executive and Senior Leadership and apologized for the lack of financial management controls. *Id.* at ¶ 53.

As of the date of termination of Turner's employment in December 2012, Defendants had taken no action to correct the audit firm's multiple findings, and upon information and belief, the lack of financial controls and inaccurate invoicing of the Federal Government is continuing to date. *Id.* at ¶ 54. During 2010, 2011, and 2012, KFORCE intentionally overstated KGS's value by releasing false future expected profits figures, known to be unattainable. *Id.* at ¶ 55.

During a subsequent audit, KFORCE executive Bill Sanders instructed Turner and Grant to support those false future expected profits figures in communications with auditors, which Turner refused to do. *Id.* at ¶ 56. KGS was eventually forced to take an impairment of $65.3 million dollars as a result, and upon information and belief, that impairment did not adequately correct the false impression KFORCE and KGS gave. *Id.* at ¶ 57. Turner believes that KFORCE went through a phase two impairment review. *Id.* at ¶ 58.

Throughout Turner's employment with Defendant KGS, he received repeated exemplary performance evaluations and positive comments regarding the performance of his duties. *Id.* at ¶

59. Turner has never been warned, reprimanded, reproved or criticized in any way for the manner in which he performed his duties, or for compliance related issues. *Id.* at ¶ 60.

On or about December 6, 2012, in a meeting with Grant and KFORCE General Counsel Bill Josey, Sanders stated that although Turner had done nothing wrong, and only had been doing his job to correct compliance issues at KGS, Grant should fire Turner, and if Grant did not fire Turner, then Grant himself would be fired. *Id.* at ¶ 63.

On or about December 7, 2012, Turner's employment was terminated in a telephone conference between Turner, Josey and Robin Roett (KFORCE's Director of Human Resources). *Id.* at ¶ 66. At this time, Josey informed Turner he was being terminated as the result of information uncovered during compliance oversight activities. *Id.* at ¶¶ 67-68. Josey stated that Defendants were in possession of information that Turner's actions were jeopardizing KGS's performance under the Administrative Agreements. *Id.* at ¶ 69. Josey also stated that Defendants were in possession of information that Turner's actions were in opposition to the requirements of the Administrative Agreements and that Turner failed to implement a close integration of the Compliance Officer into Turner's leadership team. *Id.* at ¶¶ 70-71. Josey informed Turner that Grant knew about the termination and had authorized it. *Id.* at ¶ 73.

Turner believes that after his termination one or more representatives of Defendants informed the Monitor overseeing compliance with KGS's Administrative Agreements that Turner had been terminated due to lack of performance, compliance violations and/or violation of the provisions of the Administrative Agreements. *Id.* at ¶ 74. Further, Turner believes that after his termination, one or more representatives of Defendants informed third parties and persons employed and active in the Federal Contracting industry and community that Turner had been terminated a) by Larry Grant personally; b) for performance reasons, or otherwise for "cause"; c)

for compliance related reasons; and/or d) that Turner was personally being considered for debarment from any future Federal contracting work. *Id.* at ¶ 75.

Upon information and belief, no "compliance oversight activities", or other good faith investigation had taken place into Turner's performance prior to termination of Turner's employment. *Id.* at ¶ 76. Turner believes that Josey had not been authorized by KGS to terminate Turner, but rather was following the instructions from KFORCE. *Id.* at ¶ 77. Turner also believes that at the time Josey told Turner he was fired, no one had informed KGS executive leadership, or the KGS Board of Directors, nor had anyone at KGS authorized Turner's termination. *Id.* at ¶ 78.

Soon after his termination, Turner received over a dozen unsolicited communications from other members of the small and tightly knit Federal Contracting industry indicating that they had received information that Turner had been terminated for performance problems, compliance concerns and in at least one case that Turner himself was being considered for debarment from future Federal Contracting work. *Id.* at ¶ 81. Turner believes that such allegations originated from Defendants KFORCE and KGS and their employees. *Id.* at ¶ 82.

## II.    *Standard of Review*

To survive a motion to dismiss, a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id*. (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Furthermore, mere naked assertions are not sufficient. *Id*.  A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted).  The court, however, is not

9

bound to accept as true a legal conclusion labeled as a "factual allegation" in the complaint. *Id*. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. (citation omitted).

### III. *Discussion*

#### A. Disclosure of Amended Complaint

First, Defendants argue that, prior to filing, Turner was required to disclose his amended complaint to the United States for review and consideration pursuant to 31 U.S.C. § 3730(b)(2). Doc. 24 at p. 6. However, "the plain language of § 3730(b)(2) refers only to 'the complaint,' not amended or subsequent complaints. This fact has been recognized by other courts." *United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.,* 668 F. Supp. 2d 780, 803 (E.D. La. 2009). *See also United States ex rel. Milam v. Regents of the Univ. of Cal.,* 912 F. Supp. 868, 890 (D. Md. 1995); *United States ex rel. Mikes v. Straus,* 931 F. Supp. 248, 259-61 (S.D.N.Y. 1996); *Wisz v. C/HCA Dev., Inc.,* 31 F. Supp. 2d 1068, 1069 (N.D. Ill. 1998). "[E]ven assuming for the sake of argument that [Plaintiff] violated the requirements of § 3730(b)(2), numerous courts have held that such requirements are not jurisdictional and their violation does not require dismissal of the complaint." *Branch Consultants, L.L.C.,* 668 F. Supp. 2d at 803. Thus, the Amended Complaint will not be dismissed on this basis.

#### B. Count I

In Count I, Plaintiff alleges violations of the False Claims Act, 31 U.S.C, §§ 3729, *et seq.* ("FCA"). The *qui tam* provision of the FCA authorizes private persons to initiate civil actions alleging fraud perpetrated on the United States. 31 U.S.C. § 3730(b). "If, as here, the Government declines intervention in the action, the relator can proceed with the claim and recover between 25 and 30 percent of any monies recovered plus reasonable expenses and attorneys' fees and costs."

10

*United States ex rel. Heater v. Holy Cross Hosp., Inc.,* 510 F. Supp. 2d 1027, 1030 (S.D. Fla. 2007)

(citing 31 U.S.C. § 3730(d)).[2]

> To establish a claim under section 31 U.S.C. § 3729(a)(1)(A) of the FCA, a relator must plead three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. . . . To establish a claim under section 31 U.S.C. § 3729(a)(1)(B) of the FCA, a relator must also plead three elements: "(1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false."

*U.S. ex rel. McGinnis v. OSF Healthcare Sys.*, Case No. 11-cv-1392, 2014 U.S. Dist. LEXIS 89167, 16-17 (C.D. Ill. July 1, 2014) (internal citations omitted).

> A complaint alleging a violation of the FCA must meet the particularity requirements of Rule 9(b). *See Corsello,* 428 F.3d at 1012. To satisfy this requirement, "the complaint must allege facts as to time, place, and substance of the defendant's alleged fraud, and the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1310 (11th Cir. 2002)) (internal quotation marks and alterations omitted). Additionally, the complaint must contain "some indicia of reliability" that a fraudulent claim was actually submitted to the government. *Id.* at 1012, 1014. "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Id.* at 1012 (citation omitted).

*Jallali v. Nova Southeastern Univ., Inc.,* 486 Fed. Appx. 765, 766 (11th Cir. 2012).

Here, Plaintiff alleges that Defendants submitted false claims to the government in the form of invoices that were based on incorrect provisional rates. Plaintiff argues that, while the invoices themselves were not fraudulent on their face, they were based on fraudulent provisional rates. Both parties have directed the Court to *Dyer v. Raytheon Co.* for an explanation of the billing process at issue here. "The government establishes a provisional cost billing rate at the beginning of each year so that [the contractor] can recover its costs over the course of the year despite the fact that it

---

[2] Although the Government declined to intervene in this case, it has filed a statement of interest regarding the instant motion to dismiss and has requested that, if Count I is dismissed, it be dismissed without prejudice as to the United States. See Doc. 38 at p. 2.

11

does not yet know the actual amount of its indirect costs for the year." *United States ex rel. Dyer v. Raytheon Co.,* Civil Action No. 08-10341-DPW, 2013 U.S. Dist. LEXIS 135691, 85 (D. Mass. Sept. 23, 2013). The government establishes this rate and the contractor "periodically invoices the government based on the provisional cost billing rate throughout the year, rather than billing based on its actual costs." *Id.*

> At the end of the year, Raytheon calculates is actual costs and submits final indirect cost rate proposals for each relevant business. These final proposals include a representation, required by FAR, *see* 48 C.F.R. 42.703-2, that,
>
>> [a]ll costs included in this proposal . . . are allowable in accordance with the cost principles of the Federal Acquisition Regulation (FAR) and its supplements applicable to the contracts to which the final indirect cost rates will apply; and . . . [t]his proposal does not include any costs which are expressly unallowable under applicable cost principles of FAR or its supplements.
>
> The Defense Contract Audit Agency ("DCAA") then audits the final proposal for potentially unallowable costs and makes a recommendation to the Defense Contract Management Agency ("DCMA") officer, who makes the final decisions on any remaining questions concerning the allowability of costs. *See* 48 C.F.R. 42.705-1(b). Once the audit is complete, [the contractor] and the government negotiate the final indirect cost rate for the year and [the contractor] issues a final set of invoices designed to account for any discrepancy between the provisional billing rate and the final one. *See id.*

*Id.* at 86.

Here, Turner alleges that Defendants – rather than the government – established the provisional rates, and did so in a fraudulent manner by using old rates and/or incorporating inflated estimates of indirect costs. Turner concedes that the submission of provisional rates does not qualify as "submission of a claim" under the FCA.

Instead, Turner claims that submission of the invoices, based on the provisional cost billing rate, throughout the year amounts to submission of false claims under the FCA. Turner concedes that the invoices themselves do not contain any false or fraudulent information, but

asserts that they are "false claims" because they are based on the fraudulent information presented in the provisional rate submissions. The *Dyer* court specifically disagreed with this theory stating that "each invoice bills the government at the established provisional billing rate until the end-of-year final application invoices which are designed to account for any discrepancies." 2013 U.S. Dist. LEXIS 135691 at 87. *See also Massachusetts v. Schering-Plough Corp.,* No. 03-11865, 2011 U.S. Dist. LEXIS 108650, 2011 WL 4436969, *3 (D. Mass. Sept. 23, 2011). "If there is any implied certification, it could only be that the invoices accurately reflect the agreed-upon provisional billing rate." 2013 U.S. Dist. LEXIS 135691 at 89. "As a result, they cannot and do not falsely represent or certify compliance with federal billing regulations. . . ." *Id.*

Turner encourages this Court to reject the reasoning in *Dyer* and hold that submission of the invoices constitutes submission of a false claim under the FCA. Turner does not, however, offer any authority for this position. As noted in *Dyer* and admitted by Turner, the invoices themselves are not false or fraudulent. Furthermore, the government knows when receiving these invoices that they are not for actual costs incurred. The invoices are based on the agreed upon provisional rates. Thus, the submission of the invoices cannot support a claim under the FCA.

Plaintiff also alleges that the final proposals *may* have contained false information regarding indirect costs, *if* they were submitted. This supposition cannot support a claim under the FCA. The Eleventh Circuit's holding in *Klusmeier v. Bell Constructors, Inc.,* 469 Fed. Appx. 718 (11th Cir. 2012) is instructive here. In *Klusmeier* the Court rejected claims by a relator who had no personal knowledge of the actual submission of invoices. *See Jallali,* 486 Fed. Appx. at 766-767. Here, Turner admits having no knowledge of whether any final proposals or invoices were even submitted, and certainly has no knowledge of the content of such documents. Thus, he cannot state an FCA claim based on the year-end proposals or invoices. Without specific facts to support

submission of a false claim by either defendant, Count I cannot proceed. *See United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1357 (11th Cir. 2006).[3]

Turner suggests that his claim is similar to those in *United States ex rel. Walker v. R&F Properties of Lake Cty., Inc.,* 433 F.3d 1349 (11th Cir. 2005) and *Hill v. Morehouse Medical Assocs., Inc.,* Case No. 02-14429, 2003 U.S. App. LEXIS 27956 (11th Cir. Aug. 15, 2003), and he should be able to proceed under that precedent. However, in neither case did the relator allege an FCA claim on invoices that admittedly were not fraudulent. *See United States ex rel. Heater v. Holy Cross Hosp., Inc.,* 510 F. Supp. 2d 1027, 1035-1036 (S.D. Fla. 2007) (internal footnote and citations omitted). Moreover, unlike the relators in *Walker* and *Hill*, Turner has admitted that he does not even know if the final invoices (the only documents that might actually be considered "claims") were sent to the government, let alone whether they were false or fraudulent. Thus, the instant case is not analogous to either *Walker* or *Hill*, and certainly is not controlled by them. Without any knowledge of the final invoices at all, Turner cannot provide "indicia of reliability" to satisfy the Rule 9 pleading requirements. Accordingly, Count I must be dismissed for failure to state a claim.

In his response and at the hearing, Turner requested leave to file a second amended complaint. "Ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint." *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1014 (11th Cir. 2005). Leave to amend, however, need not be granted where, *inter alia,* amendment would be futile. *Id.* Given that the facts previously plead by Turner preclude a claim under the FCA, leave to amend would be futile. Furthermore, Turner's request to amend is deficient because he fails to describe

---

[3] Congress amended the FCA in May of 2009 with the Fraud Enforcement and Recovery Act ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009). Among other things, FERA re-designated § 3729(a)(1) as § 3729(a)(1)(A), and re-designated § 3729(a)(2) as § 3729(a)(1)(B). These amendments do not change the requirement that there must be submission of a false claim under the act.

the substance of his proposed amendment. *See Klusmeier,* 469 Fed. Appx. at 722. Thus, Count I will be dismissed with prejudice as to Turner and without prejudice as to the United States. *See United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 455-456 (5th Cir. 2005).

### C. Count II

In Count II Turner asserts an FCA retaliation claim brought pursuant to 31 U.S.C. § 3730(h) which does not require a showing of fraud and therefore need not meet heightened pleading requirements of Fed. R. Civ. P. 9(b). *Mendiondo v Centinela Hosp. Med. Ctr.,* 521 F3d 1097 (9th Cir. 2009). Instead, FCA retaliation claims must meet Fed. R. Civ. P. 8(a) notice pleading standard. *Id.*

Turner alleges that Defendants are "jointly and severally liable" for retaliation pursuant to 31 U.S.C. § 3730 which states, in pertinent part:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter [31 USCS §§ 3721 *et seq*.].

31 U.S.C. § 3730(h)(1) (2014).

> In order to survive a motion to dismiss, a complaint alleging FCA retaliation claims brought pursuant to 31 U.S.C. §3730(h)(1) . . . must contain factual allegations that if proven would establish that 1) the Relator was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA [("protected conduct")], 2) the employer knew Relator was engaged in protected conduct, and 3) the employer was motivated to take an adverse employment action against the Relator because of the protected conduct.

*McGinnis,* 2014 U.S. Dist. LEXIS 89167, 34-35.

With regard to protected conduct, the Amended Complaint contains allegations that Turner made internal reports about the allegedly improper provisional rates being used by KGS. Generally, this would be a sufficient allegation to survive a motion to dismiss. *See, e.g., Marbury v. Talladega College,* Case No. 1:11-cv-03251-JEO, 2014 U.S. Dist. LEXIS 7635, 37 I.E.R. Cas. (BNA) 1147 (N.D. Ala. Jan. 22, 2014). However, as Turner's counsel repeatedly noted during the hearing on this matter, by making these reports Turner was just doing his job. Turner alleges that he was hired with the specific mandate "to ensure KGS was compliant with all Federal regulations and requirements applicable to KGS as a Federal contractor in addition to other duties assigned." Doc. 18 at ¶ 21. "[C]ourts have held that employees whose complaints fall within the scope of their job duties must provide their employers with clear notice of their intent to pursue an FCA action in order to satisfy the second element of a retaliation action under the statute." *Sicilia v. Boeing Co.,* 775 F. Supp. 2d 1243, 1254 (W.D. Wash. 2011). See also Mack v. Augusta-Richmond County, 148 Fed. Appx. 894, 897 (11th Cir. 2005) (citing *Maturi v. McLaughlin Research Corp.,* 413 F.3d 166, 173 (1st Cir. 2005)("Where an employee's job responsibilities involve overseeing government billings or payments, his burden of proving that his employer was on notice that he was engaged in protected conduct should be heightened. Yet, such an employee can put his employer on notice 'by any action which . . . [,regardless of his job duties,] would put the employer on notice that [FCA] litigation is a reasonable possibility.'")).

Here, there are no allegations that Turner put Defendants on notice of his alleged whistleblowing activities. Instead, Turner has affirmatively represented that he was "just doing his job." Accordingly, there are no, and can be no, factual allegations to support a finding that Turner engaged in protected conduct and this claim cannot stand.

Moreover, Turner cannot allege that his employer was motivated to take an adverse employment action against him because of the alleged protected conduct. In the Amended Complaint Plaintiff alleges that he was employed by KGS only, but that KFORCE employees misrepresented their authority and terminated Turner's employment over the objections of KGS. Plaintiff's counsel argues that Turner must be allowed to bring this claim against KFORCE because he cannot allege retaliation against KGS as it did not take the adverse employment action. However, Plaintiff has found no authority that would permit liability on the part of KFORCE for an allegedly adverse employment action against another entity's employee. Plaintiff requested leave to amend so that he may incorporate his allegations regarding piercing the corporate veil into Count II, however, such incorporation would be futile.

> [T]o "pierce the corporate veil" [] the plaintiff must prove that:
>
> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;
>
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
>
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Molinos Valle Del Cibao, C. por A. v. Lama,* 633 F.3d 1330, 1349 (11th Cir. 2011). "Over and above formal ownership, 'the parent corporation's control must 'amount to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.'" *Lobegeiger v. Celebrity Cruises, Inc.,* 869 F. Supp. 2d 1350, 1353-1354 (S.D. Fla. 2012) (quoting *Baker v. Raymond Int'l, Inc.,* 656 F.2d 173, 181 (5th Cir. 1981)). Typically, a court will pierce the corporate veil when a corporation does not have funds to satisfy a judgment, so that

corporations may not hide assets by simply passing them to other individuals or entities. *In re Air Crash near Rio Grande P.R. on December 3, 2008*, Case No. 11-md-02246-KAM, 2013 U.S. Dist. LEXIS 57270, 18 (S.D. Fla. April 22, 2013).

Turner's allegations regarding piercing the corporate veil indicate that KFORCE controlled KGS only with regard to the termination of Turner's employment. *See* Doc. 18 at ¶¶ 247-267. Turner has not made factual allegations which suggest that KGS manifests no separate corporate interests of its own and functions solely to achieve the purposes of KFORCE. In fact, Plaintiff alleged that KGS' president, Larry Grant, refused to follow instructions from KFORCE and that the entities conspired with each other in the alleged schemes. Plaintiff does not allege that KFORCE was dominating KGS, but instead claims that when KGS would not do what KFORCE wanted, KFORCE falsely claimed to have authority to act on behalf of KGS and "terminated" Turner's employment with KGS. Even if Turner could allege facts to show domination, he has no legal support for his contention that piercing the corporate veil would mean that KFORCE could be held liable for alleged retaliation that KGS itself could not be held liable for under the FCA. Ultimately, Plaintiff has conceded any retaliation claim against KGS and cannot support such a claim against KFORCE. Accordingly, Count II will be dismissed with prejudice.

### D.  Counts III, IV and V

Because the Court has disposed of all federal claims, and the only claims remaining are those brought under Florida statutory or common law, the Court declines to exercise supplemental jurisdiction over these claims. Therefore, Turner's remaining state-law claims will be dismissed without prejudice to being refiled in an appropriate state court. *See* 28 U.S.C. § 1367(c)(3) ("district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction.").

The Supreme Court has advised that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

### IV.    *Plaintiff's Motions to Amend*

While this Motion to Dismiss was pending and subsequent to the hearing, Plaintiff filed motions for leave to file a second amended complaint. *See* Docs. 60, 61 and 66. The first motion was replaced by an amended motion, which was denied for failure to attach the proposed amended complaint to the motion. *See* Doc. 65. Plaintiff then filed a motion for reconsideration of the order denying leave to amend. *See* Doc. 66. Defendants have responded to that motion. *See* Doc. 67.

The Court has reviewed the proposed second amended complaint and has determined that the amendment would be futile. *See Corsello v. Lincare, Inc.,* 428 F.3d 1008 (11th Cir. 2005) (denying motion for leave to amend in a False Claims Act case because the amendments would have been futile). As discussed above, it is Plaintiff's own allegations that defeat his claims under the FCA. Layering additional allegations on top of those does not save those claims. Even considering those additional allegations, Plaintiff has no facts to support submission of a false claim by Defendants.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1.    Defendants' Motion to Dismiss Amended Complaint (Doc. 24) is GRANTED.

2.    Count I is dismissed with prejudice as to Turner and without prejudice as to the United States;

3.    Count II is dismissed with prejudice;

    4.      Counts III, IV and V are dismissed without prejudice because the Court declines to exercise supplemental jurisdiction over Turner's state law claims;

    5.      Plaintiff's Motion for Reconsideration (Doc. 66) is DENIED; and

    6.      The Clerk is directed to close the file.

**DONE AND ORDERED** in Tampa, Florida on November 10, 2014.

*[signature]*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any